UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DEALERWING LLC,

                                    Plaintiff,

          v.

JON LERNER, JOSEPH YURMAN, II,
12/21 CONSULTING GROUP LLC,
VERTICAL INTEGRATED NETWORK
SOLUTIONS, LCC,

                                    Defendants.

No. 21-CV-6429 (KMK)

OPINION & ORDER

Appearances:

Ariadne Anna Panagopoulou Alexandrou, Esq.
Peter T. Shapiro, Esq.
Lewis Brisbois Bisgaard & Smith LLP
New York, NY
*Counsel for Plaintiff*

Christine Rosalie Zaffarano, Esq.
Copycat Legal PLLC
Coral Springs, FL
*Counsel for Defendants*

Daniel Desouza, Esq.
DeSouza Law, PA
Coral Springs, FL
*Counsel for Defendants*

Christian Alan Petersen, Esq.
Olive Judd, PA
Fort Lauderdale, FL
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Dealerwing LLC ("Dealerwing" or "Plaintiff") brings this Action against Jon

Lerner ("Lerner"), Joseph J. Yurman, II ("Yurman"), 12/21 Consulting Group ("Consulting"),

Vertical Integrated Network Solutions, LLC ("VINS"; collectively, "Defendants") alleging several causes of action arising out of Defendants' alleged use of Dealerwing's proprietary information.  (*See generally* Fourth Am. Compl. ("FAC") (Dkt. No. 92.)  Before the Court is Defendants' Motion for Partial Summary Judgment.  (*See* Not of Mot. (Dkt. No. 114).)  For the foregoing reasons, Defendants' Motion is granted in part and denied in part.

<u>I.  Background</u>

A.  <u>Factual Background</u>

The Court assumes the Parties' familiarity with the facts of this case as described in the Court's June 20, 2024, oral ruling.  It recounts here only select undisputed facts relevant to Defendants' Motion.

1.  <u>GG Marketing, RAAP, and Dealerwing</u>

GG Marketing LLC ("GG Marketing"), which is not a party to this case, operated as "a Florida limited liability company with Glenn Gibson ("Gibson") as its sole original member." (Defs' 56.1 ¶ 1 (Dkt. No. 119); Pl's Resp. 56.1 ¶ 1 (Dkt No. 130).)  In May 2013, David Lampel ("Lampel") became a member of GG Marketing, and subsequently obtained a 70% ownership share of the LLC.  (Defs' 56.1 ¶ 2; Pl's Resp. 56.1 ¶ 2; *see also* Decl. of David Lampel ("Lampel Decl.) ¶ 15–18 (Dkt. No. 123.)

GG Marketing generally did business as Rebuild America Auto Program ("RAAP"). (Defs' 56.1 ¶ 4; Pl's Resp. 56.1 ¶ 4.)  RAAP never existed as a separate legal entity but was registered as a fictitious name for GG Marketing.  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5; Lampel Decl. ¶ 12.)

On July 6, 2015, Lampel created a new entity, Dealerwing LLC, which he owned and managed.  (Defs' 56.1 ¶ 7; Pl's Resp. 56.1 ¶ 7.)  Lampel's intention in creating Dealerwing was

"to take over [RAAP]'s operations entirely." (Lampel Decl. ¶ 23.)[1] Soon after, in August 2015, RAAP ceased conducting business, resulting in its administrative dissolution the following year. (*See* Decl. of Christian A. Petersen ("Petersen Decl.") Ex. 3 (Florida Division of Corporations report listing GG Marketing as "INACTIVE" as of September 23, 2016) (Dkt. No. 118-3).)

After RAAP ceased operations, Dealerwing began conducting business with RAAP's customers, providing the same services at the same rates. (*See* Defs' 56.1 ¶ 10; Pl's Resp. 56.1 ¶ 10; *see also* Lampel Decl. ¶ 27–29 (listing clients that "moved from RAAP to Dealerwing").) Despite this "informal[] assign[ment]" of business, (Lampel Decl. ¶ 28), there was no document memorializing any transfer of assets, liabilities, rights, or obligations between the two entities, (Defs' 56.1 ¶ 10; Pl's Resp. 56.1 ¶ 10).[2]

### 2. Lerner, Yurman, and Consulting

Sometime in 2015, RAAP hired Lerner, who previously worked as an independent contractor, to conduct sales and related activities as Vice-President of the Northeast Region. (Defs' 56.1 ¶ 11; Pl's Resp. 56.1 ¶ 11; *see also* Lampel Decl. ¶ 43.) On August 7, 2015, presumably before he was hired, Lerner executed a non-disclosure agreement, (*see* Lampel Decl., Ex. N ("Lerner NDA") (Dkt. No. 123-14)), with RAAP in relation to a "potential business transaction," (Defs' 56.1 ¶ 12; Pl's Resp. 56.1 ¶ 12; *see also* Lampel Decl. ¶ 44).[3]

---

[1] Dealerwing disputes Defendants' statement that Dealerwing "was intended specifically to allow Lampel to conduct business without the involvement of his former partner, Gibson." (Pl's Resp. 56.1 ¶ 8.) The Court instead quotes Lampel's own declaration, which Dealerwing references in its denial. (*See id.*)

[2] Lampel testified that: "All I know is that the business of GG Marketing and RAAP was basically assumed by Dealerwing, all the clients, all the business, all of the invoices, all of the expenses were assumed by Dealerwing." (Petersen Decl., Ex. 11 ("Lampel Dep.") at 236:15-20 (Dkt. No. 118-11).)

[3] The record does not provide a clear timeline of Lerner's hiring. Based on Lampel's testimony, it appears that the "potential transaction" in the NDA refers to Lerner "looking at

That agreement contains a few key provisions.  It defines as parties "Rebuild America Auto Program LLC" and "Jon Lerner" and states that the agreement arises out of the "need for each Party to disclose certain confidential and proprietary information . . . to the other Party." (Lerner NDA pmbl.)  Section 1 contains a "[n]on-disclosure and [l]imited [u]se" provision which lists several restrictive covenants ensuring that each party will hold the other's proprietary information in confidence.  (*Id.* § 1.)  Section 2 contains a non-compete clause providing:

> Throughout the duration of this agreement, and for a period not to exceed 3-three years following the culmination, completion, or termination of this agreement, each Party shall not, in any manner, represent, provide services, or engage in any aspects of business that would be deemed similar in nature to the business of the other Party, its subsidiaries, and any current or former clients, vendors, and/or customers, without the expressed written consent of the originating Party.

(*Id.* § 2.)  And Section 5 provides:

> Regardless of whether the Potential Transaction is consummated, the covenants pertaining to nondisclosure shall remain in full force for a period of 3 years, unless a Party expressly agrees in writing to release all or part of the Proprietary Information from the nondisclosure restrictions imposed hereunder.

(*Id.* § 5.)  Finally, the Lerner NDA states that it "shall be binding upon and for the benefit of the Parties and their successors and assigns."  (*Id.* § 8.)

At various points in time, Yurman and Consulting—an entity Yurman owns—worked as independent contractors for Dealerwing.  (Defs' 56.1 ¶ 26; Pl's Resp. 56.1 ¶ 26.)  On November 14, 2018, Yurman and Dealerwing executed a "Mutual Nondisclosure Agreement" (the "Yurman NDA").  (Defs' 56.1 ¶ 27; Pl's Resp. 56.1 ¶ 27; *see also* Lampel Decl., Ex. P (Yurman NDA) (Dkt. No. 123-16).)  That agreement contained non-disclosure and non-compete provisions similar to the Lerner NDA, (*compare* Lerner NDA §§ 1–2 *with* Yurman NDA §§ 1–2), and

---

coming to work with [Lampel] at [RAAP]."  (Lampel Dep. at 40:21–22.)  Lampel's understanding was that the NDA "would govern the potential transaction and the subsequent transaction if [Lerner] comes to work."  (*Id.* at 42:23–25.)

provided that those obligations would "survive any termination" and "continue in effect for a period of five (5) years," (Yurman NDA § 5).

Also relevant is that, in 2021, RAAP executed an agreement purporting to assign the Lerner NDA to Dealerwing (the "Assignment"). (Defs' 56.1 ¶ 21–23; Pl's Resp. 56.1 ¶ 21–23; *see* Lampel Decl., Ex. M (Assignment) at 2 (Dkt. No. 123-13); *see also* Lampel Decl. ¶ 42 (stating RAAP executed the Assignment "in 2021").) The Assignment, which is not dated, states it is "effective as of January 1, 2018." (Assignment at 2.)[4]

### 3.  Lerner & Yurman's Alleged Misconduct

Plaintiff's claims revolve around alleged misconduct by Lerner and Yurman beginning in February 2021. The particulars are not relevant to the contract law issues discussed in this Opinion, but the CliffsNotes version provides important context. As several of these facts are disputed, the Court simply notes the fact of Plaintiff's allegations.

Beginning in February 2021, Plaintiff contends that Lerner and Yurman started a competing business called Vertical Integrated Network Solutions, LLC ("VINS") designed to undercut Dealerwing's auto dealer marketing business. (Rule 56.1 Stmt. ("Pl's 56.1") ¶¶ 3, 96–99 (Dkt. No. 125); Defs' Resp. to Pl's Rule 56.1 ("Defs' Resp. 56.1") ¶¶ 3, 96–99 (Dkt. No. 132).) And, starting in April 2021, Lerner and Yurman allegedly began to poach Dealerwing clients, relying on proprietary trade secret information about Dealerwing's customer base. (Pl's

---

[4] There is a frustrating lack of detail about the Assignment. Despite having a January 2018 effective date, it is unclear when the Assignment was executed apart from Lampel's statement that it was signed "in 2021." (*See* Lampel Decl. ¶ 42.) Defendants, for their part, contend that the Assignment was "fabricated by one of Dealerwing's attorneys" on or about May 24, 2021—an assertion with absolutely no basis in the record and one that the Court need not consider. (Defs' 56.1 ¶ 23.) *See Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 107 (S.D.N.Y. 2023) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [Rule 56.1] Statements, the court is free to disregard the assertion." (alterations adopted) (citation omitted)); *see also Finnegan v. Berben*, No. 20-CV-10231, 2024 WL 1242996, at *1 n.2 (S.D.N.Y. Mar. 22, 2024) (same).

56.1 ¶¶ 103–05; Defs' Resp. 56.1 ¶¶ 103–05.)  These events coincided with the end of Lerner's relationship with Dealerwing on April 30, 2021, and the termination of Yurman and Consulting's relationship with Dealerwing on May 6, 2021.  (Defs' 56.1 ¶¶ 16, 29; Pl's Resp. 56.1 ¶¶ 16, 29.)[5] Among other things, Plaintiff contends that these events constituted breach of the Lerner and Yurman NDAs.  (*See* FAC ¶¶ 129–33.)

B.  Procedural History

On April 21, 2023, the Court held a pre-motion conference regarding potential dispositive briefing.  (*See* Dkt. (Minute Entry for April 21, 2023).)  On May 5, 2023, the Parties submitted a proposed schedule providing for limited discovery followed by a deadline for summary judgment motions.  (*See* Joint Ltr. to Court (May 5, 2023) (Dkt. No. 98).)  After two extensions, (Dkt. Nos. 107, 111), Defendants filed their Motion for Summary Judgment on September 1, 2023, (*see* Not. of Mot. (Dkt. No. 114); Defs' Mem. of Law in Supp. of Mot. ("Defs' Mem.) (Dkt. No. 115); Decl. of Jon Lerner in Supp. of Mot. ("Lerner Decl.") (Dkt. No. 116); Decl. of Joseph J. Yurman in Supp. of Mot. ("Yurman Decl.") (Dkt. No. 117); Decl. of Christian A. Petersen in Supp. of Mot. ("Petersen Decl.") (Dkt. No. 118); Defs' 56.1).  Plaintiff filed its Opposition on October 4, 2023, (Mem. of Law in Opp. to Defs' Mot. ("Pl's Opp. Mem.") (Dkt. No. 129)), and Defendants filed their Reply on October 19, 2023, (*see* Reply Mem. of Law ("Defs' Reply") (Dkt. No. 139)).

On September 5, 2023, Plaintiff cross moved for summary judgment on liability as to all its claims.  (Not. of Mot. (Dkt. No. 121); Mem. of Law in Supp. of Mot. ("Pl's Mem.") (Dkt.

---

[5] Defendant stated as undisputed fact that Lerner terminated his "independent contractor relationship" on April 30, 2021.  (Defs' 56.1 ¶ 16.)  Plaintiff disputed this statement, but admitted that Lerner "resigned from his affiliation with Dealerwing."  (Pl's Resp. 56.1 ¶ 16.) The Court understands Plaintiff does dispute both that Lerner was an "independent contractor" and that he was terminated by Dealerwing.  (*See* Reply Decl. of David Lampel ¶¶ 2–6 (Dkt. No. 138) (referencing Lerner's resignation).)

No. 124); Rule 56.1 Stmt. ("Pl's 56.1") (Dkt. No. 125); Lampel Decl.)  Defendants filed their

Opposition on October 4, 2023, (*see* Mem. of Law in Opp. (Dkt. No. 131)), and Plaintiffs replied

on October 19, 2023, (see Reply Mem. of Law ("Pl's Reply") (Dkt. No. 136)).

The Court heard oral argument on Plaintiff's Motion on June 20, 2024, and denied the

Motion in an oral ruling.

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In deciding whether to award summary judgment, the court must construe the

record evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also

Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to

show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373

F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*,

No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration adopted) (quotation marks and citation omitted); *see also U.S.

Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp.,*

7

*Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'"

*Id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)).  "Where a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting Fed. R. Civ. P.56(c)(4)); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (same); *E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks and citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939, 2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)).  However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without

9

more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment, *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations omitted) (quotation marks and citation omitted)). As such, "when opposing a motion for summary judgment, the non-moving party may not respond simply with general attacks upon the declarant's credibility, but rather must identify affirmative evidence from which a jury could find that the non-moving party has carried its burden of proof." *Moritz v. Town of Warwick*, No. 15-CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a motion for summary judgment,' a court may be justified in dismissing a claim when the 'plaintiff's version of the events is in such discord with the record evidence as to be wholly fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y. Mar. 11, 2010))).

   B. Analysis

   Defendants' Motion deals with a small subset of issues in this Action. The Court considered the Parties' summary judgment briefing on the lion's share of those issues at a June 20, 2024, hearing, but reserved the issues discussed below. It writes separately here because Defendants' Motion raises several legal issues that do not lend themselves to an oral ruling.

   Defendants argue (1) that, for several reasons, the Lerner NDA is unenforceable or expired, (*see* Defs' Mem. 5–19); and, separately (2) that Plaintiff failed to prove breach of

fiduciary duty as to Yurman or Consulting, (Defs' Mem. 19–21.)  The Court disagrees as to the first tranche of arguments but grants summary judgment to Defendants on the second.

### 1.  The Lerner NDA

Defendants essentially view the Lerner NDA like a block of Swiss cheese.  They contend that (a) it is unenforceable as written, (b) that it has expired, and (c) that it was never assigned to Dealerwing by its putative predecessor.  (*See generally* Defs' Mem.)

In that analysis, the Court applies Florida contract law, as the Parties agree that Florida law governs the interpretation of the NDAs.  *See Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-CV-8987, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18, 2019) ("Where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'" (alteration in original) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)); *see also Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *8 (S.D.N.Y. June 6, 2022) (applying the implied consent rule).  And both NDAs contain Florida choice-of-law provisions, which the Court has no reason to question on fraud or public policy grounds.  (*See* Lerner NDA § 6; Yurman NDA § 6.)  *See United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("New York law is unambiguous in the area of express choice of law provisions in a contract.  Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." (quoting *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996))); *see also LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, No. 17-CV-4006, 2024 WL 1116082, at *16 (S.D.N.Y. Mar. 13, 2024) (same); *cf. Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984) ("Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract[.]").

a. Enforceability

Defendants' first challenge raises an issue of contract interpretation. When interpreting a contract, the Court first examines "the plain language of the contract for evidence of the parties' intent." *Famiglio v. Famiglio*, 279 So. 3d 736, 740 (Fla. Dist. Ct. App. 2019) (citation omitted); *accord Golden v. Univ. of Mia.*, 484 F. Supp. 3d 1255, 1263 (S.D. Fla. 2020). "Provisions in a contract should be 'construed in the context of the entire agreement' and read 'in a way that gives effect to all of the contract's provisions.'" *Famiglio*, 279 So. 3d at 740 (quoting *Retreat at Port of Islands, LLC v. Port of Islands Resort Hotel Condo. Ass'n*, 181 So. 3d 531, 533 (Fla. Dist. Ct. App. 2015)); *see also Tita v. Tita*, 334 So. 3d 646, 650 (Fla. Dist. Ct. App. 2022) ("[Florida] courts are required to read the contract at issue as a whole . . . ."). "The inconvenience, hardship, or absurdity of one interpretation of a contract or its contradiction of the general purpose of the contract is weighty evidence that such meaning was not intended" by the Parties. *All Year Cooling & Heating, Inc. v. Burkett Properties, Inc.*, 357 So. 3d 131, 133 (Fla. Dist. Ct. App. 2023) (quoting *James v. Gulf Life Ins. Co.*, 66 So. 2d 62, 63–64 (Fla. 1953)); *see also Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014) (per curiam) ("Under Florida law, if one interpretation looking to the other provisions of the contract . . . would lead to an absurd conclusion, such interpretation must be abandoned[.]" (quotation marks omitted)).

Where there are no material facts in dispute and "a lawsuit depends upon the construction of a written instrument," the issue is "one of law only and determinable by entry of summary judgment." *Levitan v. Dancaescu*, 347 So. 3d 485, 489 (Fla. Dist. Ct. App. 2022) (citation omitted); *Holmes v. Fla. A & M Univ. ex rel. Bd. of Trs.*, 260 So. 3d 400, 403 (Fla. Dist. Ct. App. 2018) (same). However, "when a contract's terms are disputed and reasonably susceptible to more than one construction"—i.e. they are ambiguous—"an issue of fact is presented as to the

parties' intent which cannot properly be resolved by summary judgment." *Merlin Petroleum Co., Inc. v. Sarabia*, No. 16-CV-1000, 2017 WL 2865040, at *1 (M.D. Fla. Mar. 28, 2017) (quotation marks omitted); *accord Holmes*, 260 So. 3d at 404; *see also Donovan Marine, Inc. v. Delmonico*, 40 So. 3d 69, 71 (Fla. Dist. Ct. App. 2010) ("Ambiguity is defined as the condition of admitting more than one meaning." (quotation marks omitted)).

"The initial determination of whether [a] contract term is ambiguous is a question of law for the [C]ourt." *Levitan*, 347 So. 3d at 489. Ambiguity, in turn, comes in two flavors: patent and latent. "A patent ambiguity is intrinsically apparent on the face of the document due to the use of defective, obscure, or insensible language." *Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711, 715 (Fla. Dist. Ct. App. 2017) (quotation marks omitted). Latent ambiguities, by contrast, "arise[] when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings." *Id.* (quoting *Riera v. Riera*, 86 So. 3d 1163, 1166 (Fla. Dist. Ct. App. 2012)); *accord GE Fanuc Intelligent Platforms Embedded v. Brijot Imaging Sys., Inc.*, 51 So.3d 1243, 1245 (Fla. Dist. Ct. App. 2011). "As a general rule, evidence outside the contract language, which is known as parol evidence, may be considered only when the contract language contains a latent ambiguity." *Levitan*, 347 So. 3d at 489 (quoting *Thompson v. Watts*, 111 So. 3d 986, 989 (Fla. Dist. Ct. App. 2013)).

Defendants argue that the Lerner NDA is void because it was signed by a "non-existent entity." (Defs' Mem. 5.)[6] Their position turns on the following language:

> Rebuild America Auto Program, *LLC* ("Company") and Jon Lerner ("Party") . . . wish to explore the possibility of entering into a potential business transaction of

---

[6] This argument does *not* apply to the Yurman NDA, which was executed between "Dealerwing, LLC" and "Joseph J. Yurman II," who the Parties agree are real legal persons. (*See* Yurman NDA pmbl.)

13

mutual interest to the Parties (the "Potential Transaction"), effective as of this 7th Day of Aug. 2015.

(Lerner NDA pmbl. (emphasis added).)  Defendants contend the entire contract is void because the contracting "Party," "Rebuild America Auto Program, LLC," does not exist—in contrast to "Rebuild America Auto Program," which does.  (Defs' Mem. 5.)  Their main support comes from *Progressive Express Insurance Co. v. Hartley*, 21 So. 3d 119, 120 (Fla. Dist. Ct. App. 2009), which held an assignment agreement invalid because the intended assignee failed to renew the fictitious entity named in the agreement.

In a vacuum, the contract does seem to define a non-existent entity as a "Party."  (*See* Lerner NDA pmbl.)  But that interpretation is absurd in the context of the contract as a whole. First, every other time the contract states RAAP's name, it refers to the correct entity.  The very same paragraph refers to "Rebuild America Auto Program" with the acronym "RAAP"; "Rebuild America Auto Program" is listed on the signature page; and Lerner himself signed in his capacity as "VP RAAP."  (*See generally id.* )[7]  Second, one of the contract's purposes is to prevent the unauthorized use of "Proprietary Information," and it states expressly that the "strategic partnerships and selected vendors of suppliers" of "*Rebuild America Auto Program* . . . [are] construed as 'Proprietary Information.'"  (*Id.* pmbl. (emphasis added).)  Further, Defendants' interpretation has the added disadvantage of rendering the entire contract ineffective—the opposite of the well-established rule that a contract should be construed to give effect to all its provisions.  *See, e.g.*, *Famiglio*, 279 So.3d at 740.  The Court chooses to avoid that confusing result and construes "Rebuild America Auto Program" to be a "Party" to the Lerner NDA.  *See*

---

[7] This last fact makes Defendants' argument appear highly opportunistic.  It is hard to believe that Lerner, himself an officer of RAAP, intended to contract with a non-existent version of that same entity.  It is also notable that Lerner does not make any arguments about unilateral or mutual mistake, which are the typical justifications for recission in these circumstances.

*Interline Brands, Inc.*, 749 F.3d at 966 (stating that "[an] interpretation must be abandoned" if it "would lead to an absurd conclusion"); *see also Certain Underwriters at Lloyds, London Subscribing to Pol'y No. SA 10092-11581 v. Waveblast Watersports, Inc.*, 80 F. Supp. 3d 1311, 1319 (S.D. Fla. 2015) (same).

### b. Expiration

Defendants also argue that the Lerner NDA, effective as of August 7, 2015, has expired. (Defs' Mem. 14–19; *see* Lerner NDA pmbl. (stating the contract is effective as of August 7, 2015).) Two provisions are at issue. Section 2 of the NDA provides that the non-compete covenant shall apply:

> Throughout the duration of this agreement, and for a period not to exceed 3-three years following the culmination, completion, or termination of this agreement . . . .

(Lerner NDA § 2.) And Section 5 states:

> Regardless of whether the Potential Transaction [which appears to refer to the Parties' independent contractor relationship] is consummated, the covenants pertaining to nondisclosure shall remain in full force for a period of 3 years, unless a Party expressly agrees in writing to release all or part of the Proprietary Information from the nondisclosure restrictions imposed hereunder.

(*Id.* § 5.) Defendants make a variety of arguments about why these provisions, either individually or together, mean that the NDA's covenants expired in 2018. The Court, having carefully examined the NDA, disagrees.[8]

First, Defendants contend that Section 5 put the contract on a three-year clock because it defines the NDA's "[t]erm." (*See* Defs' Mem. 14.) To reach that conclusion, Defendants essentially make the following move: they read "Regardless of whether the Potential Transaction is consummated, the covenants . . . shall remain in full force for a period of 3 years"

---

[8] For the purposes of this argument, Defendants appear to assume that the NDA was assigned to Dealerwing. (*See* Defs' Mem. 14 ("If the NDA were deemed applicable to Plaintiff's claims . . . .").)

to mean that, *no matter what*, the covenants will *expire* in a period of 3 years.  (*See id.* (construing Section 5 as "limit[ing] [the NDA] to a period of three years").)  But that approach runs counter to Section 5's text and to the agreement as a whole.  By its terms, Section 5's "shall remain in full force" language does not rule out the possibility that the NDA *could* remain in force for longer than three years.  And the Court cannot add negative or limiting language to that effect.  *See Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc*., 145 So. 3d 989, 993 (Fla. Dist. Ct. App. 2014) (noting courts must "enforce the contract as plainly written" and cannot "rewrit[e] the document"); *cf. Townsend v. R.J. Reynolds Tobacco Co*., 192 So. 3d 1223, 1232 (Fla. 2016) (interpreting "shall remain" in an insurance statute and declining to add "implicit [conditional] language not present" in the text).  Confirming that textual cue, Section 2's non-compete provision expressly contemplates a term longer than three years, stating it applies "[t]hroughout the duration" of the agreement "and for a period not to exceed 3-three years" after the agreement is terminated.  (Lerner NDA § 2.)  The NDA's purpose appears to cut against Defendants, too.  As Dealerwing points out, the NDA was signed in recognition of the Parties "need . . . to disclose certain confidential and proprietary information . . . to [each]other" while exploring a potential business relationship—a statement which implies the need to protect that information if the deal falls through.  (*See id.* § 1; *see also* Pl's Opp. Mem. 12.)  Section 5 references that purpose by stating that the three-year term applies "[r]egardless of whether" their relationship comes to fruition.  (Lerner NDA § 5.)  In other words, it can logically be read to protect the Parties' information if they do not go into business together, as opposed to sunsetting the covenants if they do form a relationship.  For all those reasons, the Court does not interpret the contract to expire after three years, and denies summary judgment on that ground.

16

Second, Defendants make an alternative argument that Section 2's non-compete provision expired on August 7, 2021. This argument appears to rely on the interpretation of Section 5 that the Court rejected in the preceding paragraph. (*See* Defs' Mem. 18–19.) But to the extent it does not, the Court clarifies that Defendants' view of Section 2 is incorrect. Section 2 states that the covenant remains effective "[t]hroughout the duration of this agreement" *and* for three years after its "culmination, completion, or termination." (Lerner NDA § 2.) In general, provisions like Section 2 with "no express provision as to duration" are terminable at will, *Gort v. Gort*, 185 So. 3d 607, 613 (Fla. Dist. Ct. App. 2016) (citation omitted), "subject to the requirement of reasonable notice," *Perri v. Byrd*, 436 So. 2d 359, 361 (Fla. Dist. Ct. App. 1983).[9] Defendants do not state that the NDA was ever "completed" or "terminated." (*See generally* Defs' Mem.) And the only events indicative of termination occurred "on April 30, 2021" when "Lerner and Dealerwing" purportedly "terminated their independent contractor relationship." (Defs' 56.1 ¶ 16.)[10] Even if the contract terminated on that date, however, the non-compete provision would remain in effect for at least two years.[11] Accordingly, the Court concludes that

---

[9] The lack of a duration provision does not mean a contract is "perpetual." *See Gort*, 185 So.3d at 613. "Instead, the law generally imposes a 'reasonableness' standard upon a contract for an indefinite period." *Autonation, Inc. v. Susi*, 199 So. 3d 456, 459 (Fla. Dist. Ct. App. 2016) (quoting *Indep. Mortg. & Fin., Inc. v. Deater*, 814 So. 2d 1224, 1225 (Fla. Dist. Ct. App. 2002)). Courts have generally held that "the duration of the parties' relationship" is a "reasonable time" for such an agreement to remain in effect. *See, e.g.*, *Susi*, 199 So. 3d at 459.

[10] The Court uses "purportedly" because Defendants do not cite any evidentiary support for this statement, (*see* Defs' 56.1 ¶ 16), and Dealerwing disputes what exactly happened on that date, (see Pl's Resp. 56.1 ¶ 16 (stating Lerner "resigned from his affiliation with Dealerwing"); *see also* Lampel Decl. ¶ 65 (same).) The Court does not decide on that question here, it simply notes that the contract *could* have been terminated on that date.

[11] Under Florida law, "a post[-]term restrictive covenant" effective for "more than 2 years" is presumed unreasonable unless the covenant is "predicated upon the protection of trade secrets" or is associated with the sale of an interest in a business, corporation, partnership, or LLC. *See* Fla. Stat. Ann. §§ 542.335(d)(1), 542.335(e); *Head Kandy LLC v. McNeill*, No. 23-

the non-compete covenant did not expire in 2018, or 2021, and that it remained in effect until at least April 30, 2023, and perhaps longer depending on when (or whether) the contract was terminated.[12]  For the same reason, the Court also declines to limit claims arising out of the Yurman NDA, which contains a similar post-term provision.  (*See* Defs' Mem. 18–19.)

### c.  Assignment

Defendants next contend that the NDA was never assigned to Dealerwing by RAAP.  Their specific argument is that Dealerwing—a separate entity—did not formally succeed or merge with RAAP, and that RAAP did not assign any contract rights before it dissolved.  (Defs' Mem. 5–15.)  In opposing, and seeking judgment themselves, Plaintiff offers two theories: (1) that Dealerwing succeeded RAAP by way of a "de facto merger," and (2) that, even though it had dissolved, RAAP executed a valid assignment many years later in a wind-up transaction.  The Court considers each theory in turn.  (Pl's Opp. 6–11.)  And, as explained below, fact disputes preclude summary judgment for either party.

The basic summary judgment standard applies where, as here, the Parties cross-move for summary judgment; the Court must "determine whether either of the parties deserves judgment

---

CV-60345, 2023 WL 7318907, at *3 (S.D. Fla. Nov. 7, 2023) (adopting report and recommendation) (same).

Section 2 contains a three-year post-term restriction, and Plaintiffs do not contend that it involves the sale of a business interest.  (*See generally* Pl's Opp. Mem.)  However, the Parties dispute whether Section 2 is designed to protect trade secrets.  (*See* Defs' Mem. 15; Pl's Opp. Mem. 14–15.)  That determination turns, among other things, on whether the "Proprietary Information" defined in the contract *is* a trade secret.  *See K3 Enterprises, Inc. v. Sasowski*, No. 20-CV-24441, 2022 WL 3154178, at *5 (S.D. Fla. Aug. 7, 2022) ("To the extent the five-year confidentiality clause is predicated upon protecting information that does not rise to the level of trade secrets, however, the Court presumes it is unreasonable . . . .").  And, as the Court explained on the record at the June 20, 2024, hearing, the protected status of this information presents an issue of fact that must be resolved by a jury.  Although the Court cannot resolve that question now, it notes the issue to the extent it is relevant in later phases of this case.

[12] This finding is separate from the question of whether Dealerwing can enforce the Lerner NDA, which is addressed *infra*.

as a matter of law on facts that are not in dispute." *AFS/IBEX v. AEGIS Managing Agency Ltd.*, 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).  Even if both Parties "*assert* the absence of any genuine issues of material fact, 'a district court is not required to grant judgment as a matter of law for one side or the other.'"  *Id.* (emphasis added) (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).  Courts instead "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schmelczer v. Penn Credit Corp.*, No. 20-CV-2380, 2022 WL 862254, at *5 (S.D.N.Y. Mar. 23, 2022) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)); *accord Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002).

Before turning to Plaintiff's assignment theories, the Court notes—and the Parties do not dispute—that the NDA *could* be assigned.  Florida law does not prohibit "restrictive covenant[s]" like nondisclosure or non-compete provisions.  *See* Fla. Stat. Ann. § 542.335(1); *see also Quirch Foods LLC v. Broce*, 314 So. 3d 327, 333 (Fla. Dist. Ct. App. 2020) (characterizing "non-compete" and "non-disclosure" provisions as "restrictive covenants"); *Massey Servs., Inc. v. Sanders*, 312 So. 3d 209, 214 (Fla. Dist. Ct. App. 2021) (applying Section 542.335(1) to non-disclosure provision).  And "as long as the contract expressly provides for enforcement of the restrictive covenant by a third-party beneficiary, assignee, or successor, a court may not refuse enforcement of the restrictive covenant on the ground that the entity seeking enforcement is not a party to the contract." *Collier HMA Physician Mgmt., LLC ("Collier") v. Menichello*, 223 So. 3d 334, 339 (Fla. Dist. Ct. App. 2017) (citing Fla. Stat. Ann. § 542.335(1)(f)(1)–(2)); *see also Cellco P'ship v. Kimbler*, 68 So. 3d 914, 917 (Fla. Dist. Ct.

App. 2011) (same); *Tusa v. Roffe*, 791 So. 2d 512, 514 (Fla. Dist. Ct. App. 2001) (same). Section 8 of the Lerner NDA expressly states that the agreement is "for the benefit of" the Parties' "successors and assigns," which suffices to invoke this rule.  (Lerner NDA § 8.)  *See Corp. Exp. Off. Prod., Inc. v. Phillips*, 847 So. 2d 406, 413 n.5 (Fla. 2003) (referencing similar "successors or assigns" provision).

The question is whether Dealerwing is a "successor" or an "assignee" within the meaning of the contract and the statute.  Starting with the former, the term generally denotes "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."  *Collier*, 223 So. 3d at 339 (quoting *Successor*, Black's Law Dictionary 1660 (10th ed. 2014)); *see also Corneal v. CF Hosting, Inc.*, 187 F. Supp. 2d 1372, 1375 (S.D. Fla. 2001) (same).  An assign, by contrast, "is 'someone to whom property rights or powers are transferred by another.'"  *Foundever Operating Corp. v. Hahn*, No. 8:23-CV-1495, 2023 WL 7496150, at *5 (M.D. Fla. Nov. 13, 2023) (quoting *Assignee*, Black's Law Dictionary (11th ed. 2019) (noting an "assignee" is "also termed *assign*")).

The Florida Supreme Court has adopted a transaction-based test to determine if an entity is a "successor" which can enforce a predecessor's restrictive covenant "without the need for an assignment."  *See Foundever Operating Corp.*, 2023 WL 7496150, at *5–6.  In *Corporate Express Office Products, Inc. v, Phillips*, 847 So. 2d at 414, it explained, with reference to "fundamental principles of commercial transactions," that an entity is a "successor" in three scenarios:

> (1) a 100 percent stock purchase in which the corporate entity is unchanged except for a change in name or management; (2) a corporate merger in which two corporations unite into a single corporation and the surviving corporation assumes

the rights and liabilities of the merging corporation; or (3) where a corporation merely undergoes a name change[.]

*Johnson Controls, Inc. v. Rumore*, No. 07-CV-1808, 2008 WL 203575, *7 (M.D. Fla. Jan. 23, 2008) (citing *Corp. Exp*. 847 So. 2d at 411−14).[13]   The key is continuity of the corporate form. In the stock purchase or "name change" context, the original "corporate entity is not dissolved by [the] change in ownership" and can thus enforce agreements to which it is a party.  *Corp. Exp*., 847 So. 2d at 411 (citing *St. Petersburg Sheraton Corp. v. Stuart*, 242 So. 2d 185, 190 (Fla. Dist. Ct. App. 1970) ("Ownership by one corporation of all the stock of another corporation does not destroy the identity of the latter as a distinct legal entity. . . .")).  Similarly, in the merger context, there is a "passage of the obligations and rights of a merged corporation to the survivor of the merger" because the two entities "unite into a single corporate existence."  *Id*. at 413−14 (citing *Celotex Corp. v. Pickett*, 490 So. 2d 35, 37 (Fla. 1986)).

*Corporate Express* contrasted those scenarios with transactions involving third parties— i.e., where a "different entity" is "introduce[d] into the equation."  *Id*. at 412.  Especially relevant here, the court cited approvingly cases holding that "a new corporation" cannot enforce "a noncompete agreement entered into by a former employee and a dissolved corporation" unless it obtains an assignment or acquires rights to the contract in an asset sale.  *Id*. at 411 (citing *Johnston v. Dockside Fueling of N. Am., Inc*., 658 So. 2d 618, 619 (Fla. Dist. Ct. App. 1995) (per

---

[13] *Corporate Express* interpreted Section 542.335's predecessor statute, which permitted but did not expressly provide for the assignment of restrictive covenants.  *See* 846 So. 2d at 410 n.3 (explaining that Section 542.33—the predecessor—"did not intend to extinguish" the right to assign restrictive covenants but did not mention "assignments" specifically).  The court expressed no opinion about whether Section 542.335 "change[d] the law regarding assignments." *Id*.  Decisions applying the amended statute treat *Corporate Express* as good law, *see, e.g.*, *Collier* 223 So. 3d at 341; *Sun Grp. Enters., Inc. v. DeWitte*, 890 So. 2d 410, 411 (Fla. Dist. Ct. App. 2004), and the Court sees no reason why the amended text changes the Florida Supreme Court's analysis of "successor" or "assign."

curiam)); *see also id.* at 413 (citing *Pino v. Spanish Broad. Sys. of Fla., Inc.*, 564 So. 2d 186, 187, 189 (Fla. Dist. Ct. App. 1990) (holding that purchaser corporation could enforce a contract with a "successors or assigns" provision assigned to it as part of an asset sale)).[14]  There is a "clear distinction" between those transactions—involving a separate and distinct entity—and the ones identified in the previous paragraph where the corporate entity "continues in existence." *Id.* at 411–12 (quoting *Hawkins v. Ford Motor Co*., 748 So. 2d 993, 1000 (Fla. 1999)).  And that distinction is all that matters.  Courts applying *Corporate Express* do not "attempt to ascertain the 'substance' of the transaction" or what "really happened," they just "focus on the transaction's structure."  *See Collier*, 223 So. 3d at 341–42; *see also Johnson Controls, Inc*., 2008 WL 203575, at *7 (explaining, under *Corporate Express*, that a successor's "ability to enforce noncompete agreements . . . depends on the type of business transaction or transfer").  The same rubric applies to transactions, like the one here, involving LLCs.  *See generally Collier*, 223 So. 3d at 341 (applying the *Corporate Express* framework to an LLC acquisition); *see also MBlock Invs., LLC v. Bovis Lend Lease, Inc.*, 274 So. 3d 504, 508 n.5 (Fla. Dist. Ct. App. 2019) (citing *Corporate Express* and *Collier* and stating "[t]his principle applies to LLCs").

Dealerwing is not a "successor" under this framework that can enforce the Lerner NDA without an assignment.  It is undisputed that Dealerwing was a "wholly new entity" separate from RAAP, with whom Lerner contracted.  (Defs' 56.1 ¶¶ 7, 12; Pl's Resp. 56.1 ¶¶ 7, 12.)  Also

---

[14] The Court notes a very technical point about this case for the sake of clarity.  *Johnston* involved a situation where the purchasing corporation acquired rights to an employment contract in an asset sale, but the contract had no successors or assignation provision.  *See* 658 So. 2d at 619.  The court held that the purchaser needed employee consent to give effect to the assignment and that his "continued employment . . . in and of itself was not sufficient."  *Id.*  This case involves an antecedent question—whether Dealerwing acquired rights to the NDA in the first place—but the underlying logic is the same:  A non-successor third-party cannot enforce another entity's contract rights without a valid assignment.

undisputed is the fact that RAAP administratively dissolved in August 2016, prior to this Action. (Defs' 56.1 ¶ 6; Pl's Resp. 56.1 ¶ 6.)  Those circumstances alone are not dispositive, but the record does not reflect any event that would give rise to "successor" status under *Corporate Express*.  In fact, the Parties confirm that there "was *no* documented merger or transfer of assets, liabilities, rights, or obligations between the two entities."  (*See* Defs' 56.1 ¶ 10; Pl's Resp. 56.1 ¶ 10 (emphasis added).)  Dealerwing instead "became the . . . exclusive entity doing business with [] former RAAP customers."  (Pl's Resp. 56.1 ¶ 10.)  That admission controls as it confirms the lack of a "business transaction" in which Dealerwing "assume[d] the right to enforce [the Lerner NDA]."  *See Johnson Controls, Inc.*, 2008 WL 203575, at *7; *see also Collier*, 223 So. 3d at 342 ("[W]e must disapprove the effort to determine . . . what had 'really happened' when the dust settled after [the] acquisition . . . .  Instead, we must focus on what occurred following traditional principles of corporate and business law.").

Dealerwing's reference to the de facto merger doctrine does not alter that conclusion. (Pls' Opp. Mem. 9.)  That phrase references situations "where one corporation is absorbed by another without formal compliance with the statutory requirements for a merger."  *Lab'y Corp. of Am. v. Pro. Recovery Network*, 813 So. 2d 266, 270 (Fla. Dist. Ct. App. 2002).  But it arises, almost exclusively, as an exception to the "traditional corporate law rule" against successor liability.  *See, e.g.*, *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 151 (Fla. Dist. Ct. App. 1994).  In that context, courts hold de-facto-merged entities liable based on the "equitable principle" that no entity should be permitted to avoid tort or contract liability "through a corporate transformation in form only."  *Murphy v. Blackjet, Inc.*, No. 13-CV-80280, 2016 WL 3017224, at *4 (S.D. Fla. May 26, 2016); *see also Lab'y Corp. of Am.*, 813 So. 2d at 269 (same).

Even assuming a de facto merger occurred here—which is not clear from the record—Dealerwing's use of the doctrine is unavailing.  The Court is not aware of any case in which the de facto merger doctrine has been applied to grant an entity the benefits of a *legal* merger.  In fact, as Defendants point out, the few courts to consider the issue have rejected Dealerwing's position.  (*See* Defs' Reply 4.)  For instance, they cite a persuasive Florida case concluding that a de facto merger did not result in the transfer of "all rights and title" in patents held by a dissolved predecessor corporation.  *See eComSystems, Inc. v. Shared Mktg. Servs., Inc.*, No. 10-CV-1531, 2012 WL 171083, at *5 n.2 (M.D. Fla. Jan. 20, 2012).  De facto mergers, the court explained, "are legal fictions employed by the [c]ourts to prevent the manipulation of corporate entities," not mechanisms to "transfer assets from one entity to another."  *Id.*  And the Court has come across one other case rejecting the exact argument Dealerwing presents here, albeit applying New York law.  *See Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 410 (E.D.N.Y. 2013) (declining to expand the de facto merger doctrine to "confer upon a successor entity contractual rights to sue").  The Court agrees with that authority and declines to expand the doctrine to cover this case.[15]  Dealerwing must instead "abide by the structure[] [it] cho[se] and the consequences of th[at] choice[]."  *See In re Eastman Kodak Co.*, 624 B.R. 46, 51 (Bankr. S.D.N.Y. 2020) (collecting cases declining to expand the de facto merger doctrine).

Because Dealerwing is not a "successor," it may only enforce the Lerner NDA if it is an "assign."  On that front, Dealerwing points to an assignment agreement executed in 2021.  (*See*

---

[15] Dealerwing asserts that "[u]nder Florida law, the surviving entity after a de facto merger has 'all rights, privileges, immunities and powers, and shall be subject to all of the duties and liabilities' of the merged corporation."  (Pl's Opp. Mem. 9 (quoting *Corp. Exp.*, 846 So. 2d at 413).)  This is at best wrong and at worst misleading.  In the quoted language, *Corporate Express* refers to the effect of a *legal* merger, citing to Florida's merger statute, Fla. Stat. Ann. § 607.1106.  Dealerwing offers no argument why similar benefits apply to purported mergers that fail to comply with that provision.

Assignment Agreement; *see also* Lampel Decl. ¶ 42 (clarifying that the agreement—which is not dated—was executed in 2021).)  The Assignment, sure enough, purports to assign "right, title, and interest" in the Lerner NDA from RAAP to Dealerwing.  (*See* Assignment Agreement § 1.) The problem, however, is that by 2021, RAAP had been dissolved for roughly five years. Dissolution does not necessarily *prevent* a corporation from assigning assets, but as explained below these circumstances wade into an uncharted area of Florida law.

Florida's LLC statute provides that an LLC that "has been administratively dissolved continues in existence but may only carry on activities necessary to wind up its activities and affairs, liquidate and distribute its assets, and notify [certain] claimants."  Fla. Stat. Ann. § 605.0714(5).  When it comes to "winding up," a dissolved LLC must "discharge or make provision for the company's debts, obligations, and other liabilities" and may "[p]reserve the company's activities, affairs, and property . . . for a reasonable time."  *Id*. §§ 605.0709(2)(a), (2)(b)(1).  And "contractual rights constitute property" or "assets" which may be disposed of during wind up.  *See Crow v. State*, 392 So. 2d 919, 920 (Fla. Dist. Ct. App. 1980); *see also Corp. Exp.*, 847 So. 2d at 413 (recognizing that a "sale of [] assets" may include a "personal service contract that contains a noncompete agreement").  Although the Parties do not connect these dots, a dissolved entity logically cannot assign anything after wind-up has concluded. *Cf. Civic Ass'n of Surrey Park v. Riegel*, No. 19-CV-961, 2022 WL 1597452, at *10 (Del. Ch. May 19, 2022) (holding plaintiff had no standing to enforce assigned contract four years after assignor dissolved and one year after it wound up).

Unlike some other states, Florida does not specify how long "winding up" is presumed to last.  *See generally* Fla. Stat. Ann. § 605.0709; *cf. In re Altaba, Inc*., 264 A.3d 1138, 1144 (Del. Ch. 2021) ("By default, Delaware law contemplates a three-year winding up process . . . .").  But

Florida law does state that a LLC may preserve property "as a going concern for a *reasonable* time[.]" Fla. Stat. Ann. § 605.0709(2)(b)(1) (emphasis added). The Parties do not provide authority on this issue, and the Court, after canvassing Florida cases, did not find caselaw addressing the pertinent question here: "how long is too long?"

Defendants nevertheless contend that the five-year gap between RAAP's dissolution and the assignment is unreasonable as a matter of law. (Defs' Mem. 9.) They maintain that there is no "plausibl[e]" way RAAP could still be conducting wind-up activities and that the Assignment is simply an "ex post facto" fabrication by Dealerwing's counsel. (*Id.* (italics omitted).) While that period *seems* long, the Court has no basis to conclude it is unreasonable as a matter of law. Indeed, it is aware of "numerous cases," albeit applying New York law, concluding "that a substantial number of years was not an unreasonable amount of time for a corporation to wind up its affairs." *New Generation Wellness Chiropractic, P.C. v. Country-Wide Ins. Co*., 170 N.Y.S.3d 467, 469–70 (App. Div. 2022) (declining to find seven-to-eight-year wind-up unreasonable as a matter of law); *see also Lamarche Food Prod. Corp. v. 438 Union, LLC*, 115 N.Y.S.3d 436, 438 (App. Div. 2019) (finding entity could conduct wind-up transaction twenty-four years after dissolution and allowing it to sue for breach of contract); *Greater Bright Light Home Care Servs., Inc. v. Jeffries-El*, 58 N.Y.S.3d 68, 74 (App. Div. 2017) (finding dissolved entity could assert claims eleven years after dissolution). Defendants point to nothing in the record to demonstrate that RAAP completely wound up its affairs. And their own argument—that RAAP held onto its contract-rights post-dissolution—raises a material dispute about whether RAAP was still "winding up" until it fully assigned its property. The Court therefore declines to grant summary judgment to Defendants on this point.

Switching sides, Plaintiff contends, as a matter of law, that the assignment *was* a valid wind-up transaction. (*See* Pl's Opp. Mem. 7–8; Pl's Reply 10 (incorporating Opposition to support summary judgment motion).) But they similarly fail to clear up key fact disputes in the record. For instance, Plaintiffs' admission that RAAP both dissolved *and* "ceased conducting business in or about August of 2015," (Pl's Resp. 56.1 ¶ 6), cuts against the claim that RAAP was doing anything "for the purpose of winding up" in 2021, *see* Fla. Stat. Ann. § 605.0709(1). Also, Dealerwing's statements that it "assumed" the NDA raise questions about whether there was actually anything left for RAAP to assign. (*See* Pl's Opp. Mem. 8.) Resolving this issue in favor of either side will require testimony about the circumstances of RAAP's dissolution; the purported "intention[s]" of the Parties at that time, (*see id.*); what, if any, activities RAAP conducted in the intervening five years; and the circumstances surrounding the 2021 Assignment transaction, all of which pertain to the existence of valid wind-up activities. *See* Fla. Stat. Ann. § 605.0709. The Court therefore cannot grant judgment in favor of Dealerwing, either.

*　　*　　*

Although the Court denies summary judgment, it clarifies its holdings on the various interlocking issues discussed above. First, the Court concludes, as a matter of law, that the contract is not void on the grounds that it was executed by a non-existent entity, *see supra* § II.B.1.a; second, it concludes, as a matter of law, that Section 5 of the Lerner NDA did not cause the contract to expire in 2018, and that factual disputes remain about whether it was terminated, *see supra* § II.B.1.b; and third, it concludes that Dealerwing's ability to enforce the contract turns on disputes of fact that must be decided by a jury, *see supra* § II.B.1.c.

### 2. Fiduciary Duty

Defendants also argue that Dealerwing has failed to prove breach of fiduciary duty as to Yurman or Consulting. (Defs' Mem. 19–21.) Here too, Plaintiff has cross-moved for summary

judgment on liability as to both Defendants.  (*See* Pl's Mem. 12–15.)  As above, the Court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *See Schmelczer*, 2022 WL 862254, at \*5.

"To establish a prima facie case for breach of fiduciary duty, a plaintiff must allege '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'"  *Village of Kiryas Joel v. County of Orange*, 43 N.Y.S.3d 51, 57 (App. Div. 2016) (quoting *Varveris v. Zacharakos*, 973 N.Y.S.2d 774, 775 (App. Div. 2013)).[16]  "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."  *Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 378 (N.Y. 2008) (quotation marks omitted); *see also* Restatement (Second) of Torts § 874 (cmt. a) (same).

Whether such a relationship exists is "necessarily fact-specific" and turns on "the nexus of the parties' relationship" and the "particular contractual expression establishing the parties' interdependency."  *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 101 (S.D.N.Y. 2013) (quoting *Krys v. Butt*, 486 F. App'x 153, 154 (2d Cir. 2012)).  That inquiry is "amorphous," but "New York courts have generally described [a fiduciary relationship] as one in

---

[16] The Parties assume New York law applies to Dealerwing's tort claims.  *See Flatiron Acquisition Vehicle, LLC*, 2019 WL 1244294, at \*6.  (Defs' Mem. 19 (citing Florida and New York law); Pl's Mem. 12–13 (citing New York law).)  And that assumption aligns with New York choice of law principles, under which "New York will apply its own law" if the "relevant states' laws"—here New York and Florida—do not conflict.  *See J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of UBS-Barclays Com. Mortg. Tr. 2012-C4, Com. Mortg. Pass-Through Certificates, Series 2012-C4*, No. 19-CV-1878, 2019 WL 6619329, at \*5 (S.D.N.Y. Dec. 5, 2019); *see also Taubenfeld v. Lasko*, 324 So. 3d 529, 537–38 (Fla. Dist. Ct. App. 2021) ("The elements of a claim for breach of fiduciary duty are:  the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." (citation omitted)).

which a party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011) (quotation marks omitted). As a baseline, arms-length commercial transactions "do not create fiduciary obligations, absent express language in the contract, or a prolonged prior course of dealings between the parties establishing the fiduciary relationship." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009) (citation omitted). Instead, courts look for "a higher level of trust than is normally present in the marketplace." *Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16-CV-2555, 2017 WL 239379, at *5 (S.D.N.Y. Jan. 18, 2017) (alteration adopted) (quotation marks omitted). "The fact that an individual is labeled an 'independent contractor' does not defeat the existence of a fiduciary relationship where one would otherwise exist." *Id.* (alteration adopted) (quoting *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-CV-9116, 2009 WL 321222, at *12 (S.D.N.Y. Feb. 9, 2009)).

Defendants argue that Dealerwing failed to *allege* that Yurman and Consulting owed a fiduciary duty in the Complaint, and that its attempt to do so now should be rejected. They correctly point out that courts have "consistently ruled that it is inappropriate to raise new claims for the first time in submissions at the summary judgment stage." *Gabriel v. Newrez LLC*, No. 19-CV-6738, 2023 WL 2587506, at *7 (E.D.N.Y. Mar. 21, 2023) (quoting *Bal v. Manhattan Democratic Party*, No. 16-CV-2416, 2018 WL 6528766, at *2 (S.D.N.Y. Dec. 12, 2018)); *see also Perez v. City of New York*, No. 16-CV-7050, 2020 WL 1272530, at *13 n.8 (S.D.N.Y. Mar. 16, 2020) (collecting cases).

To determine whether a claim was plead courts apply Rule 8 which calls for "a short and plain statement of the claim" tailored to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration

omitted) (quoting, inter alia, Fed. R. Civ. P. 8(a)) (noting that "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." (alteration adopted) (quotation marks omitted)); *see also Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) (noting that "[t]he key to Rule 8(a)'s requirements is whether adequate notice is given," and that "fair notice" is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial" (citation omitted)). "Rule 8(a) [also] requires that a complaint against multiple defendants indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants." *LaForgia v. Vergano*, No. 15-CV-8589, 2017 WL 3034347, at *5 (S.D.N.Y. July 14, 2017) (quotation marks omitted); *see also Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (noting that Rule 8 permits "collective allegations," provided those allegations must "put each defendant on notice of what they allegedly did or did not do"). That requirement is not exacting, but plaintiffs run afoul of it if they "generally lump the defendants together" or if they rely on "conclusory allegations of wrongdoing." *LaForgia*, 2017 WL 3034347, at *5 (quoting *DeFazio v. Wallis*, No. 05-CV-5712, 2006 WL 4005577, at *4 (E.D.N.Y. Dec. 9, 2006)).

The FAC falls short of even this liberal bar as to Yurman and Consulting. Its only relevant allegations—and the only allegations Plaintiff points to—are that Lerner, Yurman, and Consulting collectively "misapporpriat[ed] Plaintiff's trade secrets and proprietary information in violation of their fiduciary duties," (FAC ¶ 1), and that they "took action to engage in [] unfair competition . . . in violation of their contractual obligations and fiduciary duties," (*id*. ¶ 2; *see also id*. ¶ 105 (alleging that "Yurman[] and Consulting[] have exploited their fiduciary positions

with Plaintiff"); Pl's Opp. Mem. 18 (referencing these same provisions)).  The heading "Breach of Fiduciary Duty," where one may expect to find a "statement of the claim," is solely about Lerner and, unlike other claims, does not even reference conduct by "Defendants."  (FAC ¶¶ 111–16.)  Apart from that, the FAC says absolutely nothing about why Yurman or Consulting owed similar fiduciary obligations.  And the two paragraphs quoted above, which are both collective and conclusive, are far from sufficient to satisfy Rule 8.  *See Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020) (finding fiduciary duty claim deficient under Rule 8 where "not a single allegation specifies which defendant engaged in what misconduct"); *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 498 (S.D.N.Y. 2017) (dismissing fiduciary duty claim consisting of a "bare recitation[] of the legal elements of a fiduciary duty" (citing, inter alia, *Boley v. Pineloch Assocs, Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988) (holding that an allegation that "defendants entered into a fiduciary relationship of trust and confidence with plaintiffs" was "a conclusory allegation" that "does not satisfy Rule 8"))).  The FAC therefore cannot be said to give Yurman and Consulting "fair notice" of a breach of fiduciary duty claim.  *See* Fed. R. Civ. P. 8(a).

Plaintiff's argument in response is unavailing.  Apart from the deficient introductory allegations discussed above, it contends that the heading "Count IV Breach of Fiduciary Duty," combined with the SAC's reference elsewhere to allegedly harmful conduct by "Defendants," is enough notice for purposes of Rule 8.  (Pl's Opp. Mem. 18–19.)  On its own, that position is dubious given Count IV's substantive paragraphs only reference "Lerner."  (FAC ¶¶ 112–16.)  But beyond that, a "heading" combined with a "naked assertion [of harm] fails to satisfy Rule 8." *See Gallagher v. Lactalis Am. Grp., Inc.*, No. 22-CV-614, 2023 WL 6224881, at *6 (W.D.N.Y. Sept. 21, 2023).  Dealerwing must, at the very least, "specify for the Court who is being sued for

what cause of action." *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42, 2011 WL 7053807, at *17 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

Accordingly, because Dealerwing did not plead a breach of fiduciary claim against Yurman and Consulting in the SAC, it may not present that claim for the first time at summary judgment. *See Perez*, 2020 WL 1272530, at *13 n.8 (noting a plaintiff "cannot raise [] claims at summary judgment" that were "not pled in the [c]omplaint"); *see also Rao v. Rodriguez*, No. 14-CV-1936, 2017 WL 1214437, at *5 n.8 (E.D.N.Y. Mar. 31, 2017) (holding claim for coerced resignation was "barred in light of [the p]laintiff's failure to include any such claim in his complaint before the Equal Opportunity Employment Commission or in his complaint in this action"); *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 214 (S.D.N.Y. 2017) (explaining that "[a]llowing [the plaintiff] to proceed on [a] new theory of liability would effectively amend the complaint at the summary judgment stage" and that "[a]n opposition to a summary judgment motion is not the place for a plaintiff to raise new claims" (citations omitted)).

### III.  Conclusion

For the aforementioned reasons, Defendants' Motion is granted in part and denied in part. Specifically, the Court grants summary judgment to Yurman and Consulting on Plaintiff's breach of fiduciary duty claim and denies the Motion in all other respects subject to its holdings as discussed in Section II.B.1.

The Clerk of Court is respectfully directed to terminate the pending Motion.  (Dkt. No. 114.)

SO ORDERED.

Dated:    September 19, 2024
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge